UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 13-007-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MARQUES DAWSON and | ) | **MEMORANDUM OPINION** |
| MANEE SHEPHARD, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendant Manee Shephard and Marques Dawson's Motion to Suppress all evidence obtained from the residence located at 380 White Oak Trace in Fayette County, Kentucky.[1]  [Record No. 26]  The defendants seek to suppress all of the evidence obtained from two searches performed by the Lexington Police Department.  The motion was referred to United States Magistrate Judge Robert E. Wier to conduct an evidentiary hearing and to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  On March 5, 2013, Magistrate Judge Wier conducted an evidentiary hearing regarding the motion.  On March 15, 2013, he issued a Recommended Disposition, recommending that the Court deny the motion to suppress because the initial search of the residence was lawful as an emergency-aid

---

[1] On March 25, 2013, the Court granted Marques Dawson's Motion to Join Manee Shephard's Motion to Suppress.  [Record No. 54]  For the reasons explained more fully in the Magistrate Judge's Recommended Disposition of the Motion to Join, the Court found that Marques Dawson had standing to challenge the search of 380 White Oak Trace.  [Record No. 43]

exception to the warrant requirement.² [Record No. 44] The defendants have each filed objections to the Recommended Disposition and the United States has responded. [Record Nos. 50, 53, 55] After reviewing the Recommended Disposition, and having considered the defendants' objections, the Court will deny the motion to suppress.

## I.

At 5:34 a.m. on November 7, 2012, the Lexington Division of Police were called by nurses at St. Joseph Hospital after the arrival of assault victim Marques Dawson.³ Dawson had been dropped-off at the emergency room by an unidentified black female who apparently left the emergency room when the nurses decided to call the police. Beginning at 5:59 a.m., two police officers (Sgt. Greathouse and Officer Williams) were separately dispatched to St. Joseph's Hospital. However, before the officers arrived, Dawson was transferred to the University of Kentucky Hospital because of the severity of his injuries. According to police logs, Officer Williams arrived at UK Hospital at 6:18 a.m., while Sergeant Greathouse arrived at UK Hospital at 6:46 a.m. Officer Williams was delayed in interviewing Dawson because of the significance of the injuries suffered and the nature of Dawson's treatment. [Record No. 39, p. 7] The officers observed that Dawson had serious injuries, including head trauma, a possible skull fracture, and burns from an iron. [*Id.*] During the initial interview, Dawson told the officers that

---

² Alternatively, the magistrate judge found that, even if the search was unlawful, the exclusionary rule should not apply because of the good faith exception.

³ A more complete version of the relevant facts is contained in the Recommended Disposition. [Record No. 44] The Court adopts and incorporates these facts by reference. However, where the defendants dispute certain factual findings, the Court will address these disputes in turn.

he was asleep at home on his couch when he was attacked, bound, and beaten by armed men. Specifically, Dawson was bound at the ankles and wrists, burned with an electric iron on various parts of his body and assaulted with a dumbbell weight while the assailants made demands for his property. Additionally, Dawson "referred [to Williams] that a female and an infant child – or a child also resided with him at the residence." [*Id.*, p. 9] Officer Williams believed that Dawson told him the woman and child were at the residence during the violent home invasion.[4]

After interviewing Dawson, the officers left UK Hospital at 7:53 a.m. They traveled to 380 White Oak, using a "tactical" approach whereby they did not travel with lights and sirens activated. Additionally, they parked up the street from the residence. Both officers stated that there was uncertainty regarding what would be found at the home and whether any victims or suspects might still remain there. Upon approaching the residence, Williams noticed a fence with a gate ajar. The officer leaned over the fence and peered around the corner of the house onto the back porch. From this view, Williams could see "straight into the back door of the house" and observed that "the glass had been shattered, and the door was ajar." [Record No. 38, p. 10] Having confirmed and corroborated Dawson's story upon finding this point of entry, the officers decided to enter the residence. First, however, they called for back-up at around 8:11 a.m. When back-up arrived, they announced themselves and "called out" into the residence, without receiving a response. The officers then performed a "protective sweep," to look for victims and/or suspects of the assault. [*Id.*, pp. 14-15, 66] The sweep took about two to three minutes,

---

[4] This belief was confirmed to be true when Manee S. Shephard showed-up at 380 White Oak during the search of the home. She advised that she was tied-up at the wrists and ankles by the home invaders, and that the suspects poured oil over her. She feared that they would try to "burn her up." [Record No. 26-8, p. 1]

and the officers exited after finding no one inside. However, during the sweep, the officers saw zip ties, blood, a money counter, a broken iron, and a bar bell, and smelled marijuana. In addition, they observed that the house appeared to have been ransacked. Detective Dunn arrived on the scene by 8:17 a.m., and also briefly entered the house during the sweep. She reportedly made it no further than the living room. Officer Williams and Sargeant Greathouse relayed their observations — from the contents of the interview with Dawson to the observations during the protective sweep — to Detective Dunn, who then conveyed the information to Detective Franz Wolff.

Detective Wolff applied for and received a warrant to search 380 White Oak at 9:26 a.m. [Record No. 26-3] The application of the warrant focused mainly on the home invasion facts; however, it also briefly listed the observations of the officers during the two to three minute protective sweep, including the binding materials, blood, and the currency counting machine. Officers then performed the search of 380 White Oak, which revealed more evidence that the defendants now seek to suppress.

## II.

In their joint motion, the defendants argue that the initial warrantless search of the curtilage and the home violated the Fourth Amendment and that any evidence obtained in the initial search was obtained unlawfully. The defendants maintain that this alleged violation taints the search warrant and all evidence obtained after the warrant was executed. The defendants argue that all evidence obtained from the initial, warrantless search and the search conducted

pursuant to the warrant should be excluded by the exclusionary rule and the fruit of the poisonous tree doctrine.

### A.   Waiver

The defendants first object to the Recommended Disposition, contending that it "is improperly based on an emergency aid exception that was not asserted by the United States as a defense to the Defendant's Motion, and was therefore waived." [Record No. 50, p. 1] In its response to the motion to suppress, the government primarily argued that the entry into 380 White Oak was lawful under a *Buie*-type exigency exception. *See Maryland v. Buie*, 494 U.S. 325 (1990) (holding that the Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest, when searching officer possesses reasonable belief based on specific and articulable facts that area harbors individuals posing danger to those on arrest scene). However, during the hearing, the Government changed its rationale to a safety or emergency-aid theory, and expressly stated that it was not pursuing the burglary-in-progress theory that the defendants anticipated. [Record No. 39, pp. 176-77] The magistrate judge relied on the government's assertion that "it's more of a health and welfare argument" at the hearing, and noted that he was not persuaded that the search would be lawful under a *Buie*-type exception, as argued in the brief.[5] [Record No. 44, p. 10]

The Recommended Disposition acknowledges that "[a]nalytically, the Government shifted gears from the briefing to the hearing." [Record No. 44, p. 10] The defendants argue that this shift was "grossly prejudicial" and impermissible under Sixth Circuit precedent as well as

---

[5] Neither the United States nor the defendants objected to the Magistrate Judge's finding that the *Buie* exception would not apply. [*See* Record Nos. 50, 55]

decisions from other circuits. *See United States v. Knowledge*, 418 F. App'x 405, 408 (6th Cir. 2011) (holding that the Government waived its argument that a defendant lacked standing when it did not raise the issue of standing in its opposition to the defendant's motion to suppress); *United States v. Abdi*, 463 F.3d 547, 562 (6th Cir. 2006)(Cole, J., dissenting) (stating that the government waived its argument, because it argued a different theory on appeal than at the district court level); *see also Borden v. Sec'y of Health and Human Serv.*, 836 F.2d 4, 6 (1st Cir. 1987) (holding, in a social security case, that a claimant waived his challenge to the ALJ's findings on emotional distress by failing to raise the challenge before the magistrate).

Contrary to the defendants' argument, the Court is not convinced that the United States waived its "emergency aid" argument by arguing that a different exception applied in its initial response to the motion to suppress. At best, the cases cited by the defendants in support of their waiver argument are distinguishable.[6]  *Knowledge* dealt specifically with the government's waiver of a lack-of-standing argument, a point not at issue here.[7]   418 F. App'x at 408.  In addition, in *Knowledge*, the district court "sua sponte" considered the United States' arguments regarding standing, without an evidentiary hearing.  *Id.*  Again, that is not the case here.  Dawson and Shephard were able to fully develop the factual record and legal arguments regarding the allegedly illegal search in this case during a lengthy evidentiary hearing.  Further, although the defendants argue that the alternative argument was unfair, it was not prejudicial to either

---

[6] The defendants' reliance on statements made by the dissent in *Abdi* are unconvincing.

[7] In *Knowledge*, the holding regarding waiver occurred after a finding that the district court erred in concluding that the defendant lacked standing to challenge a search. 418 F. App'x at 408 ("[E]ven if the district court did not err in concluding Knowledge lacked 'standing,' this argument was waived.").

defendant because they have presented a full argument to this Court regarding the "emergency aid" theory. [*See* Record No. 50, pp. 4-23] Thus, it is appropriate to consider the United States' argument regarding the emergency aid exception.

### B.     Emergency Aid Exception

The defendants argue that the "recommended disposition reaches factual findings that are not supported by the evidence of record, and omits factual findings that should have been reached." [*Id.*, p. 4] They do not dispute that, when the officers left the hospital, the officers had the following information: Dawson had sustained serious injuries; a violent home invasion had been described as occurring at 380 White Oak; an unidentified black female took Dawson to the hospital and her whereabouts were unknown; when the officers arrived Officer Williams saw that the back gate was ajar; Officer Williams leaned over the fence to view the back door and; Officer Williams saw that the back door had been kicked in. [*Id*., pp. 4-5]

However, the defendants do dispute certain factual findings of the magistrate judge. The defendants argue that the interview with Dawson could have concluded no later than 7:20 a.m. Thus, they argue that the magistrate judge erred in finding that the interview would have occurred sometime between 7:15 to 7:53 a.m. And they assert that this timing discrepancy would have some bearing on the emergency aid analysis. However, to the extent that there are discrepancies between the times in the Recommended Disposition and the officers' testimony, that discrepancy appears to be a result of the approximation made by Officer Williams. Williams testified that he was estimating the timing recollections, but relied on the log for the precise figures. [Record No. 39, pp. 23-24] After the interview with Dawson (which was complicated

by his ongoing medical treatment), the officers checked the hospital lobby for the transporting females or others connected to Dawson. The log records that the officers left the hospital at 7:53 a.m., and arrived at 380 White Oak at 8:03 a.m. [Record No. 26-5]

The defendants also argue that the officers' testimony regarding the information provided by Dawson is "inconsistent with each other and the record." [Record No. 50, p. 6] They take specific issue with whether Dawson told the officers that a woman and child were with him during the violent home invasion. During the hearing, Officer Williams recalled that Dawson "referred to a female subject and a child." [Record No. 39, p. 26] At the time of the interview, Officer Williams asked Dawson whether the female and child were with him when he was assaulted, and Williams testified he "believe[d] he said [the female and child] were there." [*Id.*] When asked whether the officers were worried that the woman and child were "laying bloody and beaten in the house," Officer Williams replied "we were, and that's why we went there, but I might say that Mr. Dawson was not exactly the most cooperative." [*Id.*] Officer Williams consistently testified that Dawson told him that a woman and child were with him in the home at 380 White Oak. As the Recommended Disposition pointed out, Sergeant Greathouse was monitoring, not conducting, the interview, yet his perception was also that Dawson refused to answer questions regarding whether there were other victims in the home. [Record No. 44, p. 6]

The defendants assert that "the most reasonable conclusion is that Officer Williams and Sergeant Greathouse did not learn of [the woman and child] from Mr. Dawson and were not aware of their existence at the time of the search." [Record No. 50, p. 8] But such a conclusion does not account for the fact that the application for the warrant conveys the officers' belief that

there were other occupants on the scene when the violent break in occurred.[8] [Record No. 26-3, p. 2 (stating that Dawson was "at his residence . . . . with his female acquaintance and a child" when the break-in occurred")]  Because: (i) the officers both testified that Dawson mentioned a woman and child; (ii) the officers believed that the woman and child were at the residence during the home invasion; and (iii) the warrant application specifically states that belief, the Court finds that the magistrate judge's factual findings on this issue are supported by the record.

As the magistrate judge points out, the defendants make much of the "mystery" surrounding the fact that the make, model, and license plate numbers for the cars in the garage appeared in the warrant application.  None of the officers recall writing down plate numbers, and Sergeant Greathouse testified that the officers entered the garage but simply shined the lights while looking for victims or suspects. [Record No. 39, p. 67]  The magistrate judge found that this issue was of no consequence, because the notation of vehicles added nothing to the warrant scope. [Record No. 44, p. 25]  However, the defendants assert that "[e]ither the officers lied on the witness stand, or there was a subsequent and undisclosed unlawful search that occurred after they left but before the affidavit was obtained for the specific purpose of obtaining more information for the warrant application." [Record No. 50, pp. 14-15]  Although it is factually problematic that none of the testifying officers remembered recording the details of the car, it does not change the Court's analysis regarding the emergency aid exception.

---

[8] While the defendants make much of the delay involved in getting to 380 White Oak, Officer Williams explained that he did not immediately call dispatch to alert of the possibility of victims because at that point the "[d]ay shift would not have been able to get there any faster than me." [Record No. 39, p. 39]

Because the Court adopts the factual findings of the magistrate judge as fully supported by the evidence presented at the evidentiary hearing and exhibits, the Court turns to the question of whether, on the basis of these facts, the government has shown that the emergency aid exception applies to validate the search. Under the exigent-circumstances exception to the warrant requirement, the United States can overcome the presumption that a warrantless entry is unreasonable if it proves that the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.[9] *Brigham City v. Stuart,* 547 U.S. 398 (2006); *United States v. Huffman*, 461 F.3d 777, 785 (6th Cir. 2006). The defendants aver that Magistrate Judge Wier "incorrectly concluded that this situation was akin" to *Huffman* because that case did not involve a factual situation where the police spoke with the victim, and because the Sixth Circuit presumed that the officers were not aware that the shots had been fired eight hours before they arrived on the scene.

However, the Court agrees that the focus of the *Huffman* court's analysis was the potential for injury to the officers or others and the need for swift action. Both of these benchmarks exist in this case, because the officers were told directly by the victim that a woman and child were with him during the violent break-in when a known victim was bound and tortured, and because of the admitted uncertainty regarding whether additional suspects or victims would be within the home. Looking to the totality of the circumstances, and viewing the

---

[9] There are no objections regarding the standard to be applied for an exigent-circumstance exception to the warrant requirement. The Court incorporates by reference the standard more fully explained in the Recommended Disposition and limits the discussion to the matters which are the subject of the defendants' objections. [Record No. 44]

necessities of the situation at the time, the Court finds that the officers reasonably believed that the woman and child were in the home, thus justifying the entry and two-minute sweep of the home.[10] The objective circumstances justified a warrantless entry under the risk-of-danger exception, as announced by *Stuart* and explained by *Huffman*. 547 U.S. 398; 461 F.3d 777.

The defendants also argue that the magistrate judge erred in applying the holding of *United States v. Colbert*, 76 F.3d 773 (6th Cir. 1996), to the *Stuart* exigency situation. In *Colbert*, the Sixth Circuit held that in a *Buie* analysis, a police officer's lack of information cannot serve as an articulable basis upon which to justify a warrantless protective sweep of the defendant's home. 76 F.3d at 778. The defendants argue that this same holding should be applied to the *Stuart* exigency analysis because the standard of reasonableness is the same for all exceptions to the warrant requirement. However, to the extent that the magistrate judge declined to so extend this rule, this was not erroneous because the officers did have an articulable basis for the protective sweep in this case. The Court has already determined that the officers knew or reasonably believed at the time of the search that a woman and child lived at 380 White Oak, and were present during the violent home invasion. Thus, even if *Colbert* is also applicable to the exigency exception — and the Court need not go so far to say that it is applicable, where the Sixth Circuit has not spoken to this issue — this is not a case where officers had no information to believe that anyone was inside the residence.

---

[10] The defendants attempt to distinguish other cases on the grounds that involved shootings rather than home invasions. However, the Court is not persuaded that violent crimes involving shootings are necessarily more likely to entail exigent circumstances than those without them. For example, in this case which undisputedly involved victims being bound and tortured with items such as irons and dumbbells, the risk of serious injury to known victims was extremely high.

### C. The Good Faith Exception

The defendants also object to the Magistrate Judge's finding that, even if the search was unlawful, the good faith exception would preclude the application of the exclusionary rule. Again, the defendants contend that the magistrate judge misapplied Sixth Circuit precedent and cases from other courts in this district. *See United States v. McClain*, 444 F.3d 556, 565 (6th Cir. 2005) (stating the factors to apply under the good faith exception); *see also United States v. Poor*, 5:11-CR-114-KKC, 2012 WL 2359436 (E.D. Ky. June 20, 2012). Looking to a recent case regarding the application and relaxation of *United States v. Leon,* 468 U.S. 897 (1984), and *McClain*, the Sixth Circuit reaffirmed that *Leon* principles apply even to a warrant secured on evidence that was unlawfully seized. *United States v. Fugate*, No. 11-3694, 2012 WL 3893114, at *4 (6th Cir. Sept. 7, 2012). There, the Sixth Circuit reiterated the purpose behind the exclusionary rule by citing the Supreme Court's recent cases on the matter:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Id.* at *4 (citing *Herring v. United States*, 555 U.S. 135, 144 (2009)).

As an initial matter, the Court finds that the magistrate judge did not err in applying the most recent case law of the Sixth Circuit and the Supreme Court, as the defendants suggest. Rather, he applied the factors of *McClain*, in conjunction with the flexible, purpose-based analysis of *Davis, Herring,* and *Fugate. See Davis v. United States*, 131 S. Ct. 2419 (2011) (holding that where the suppression of evidence, even when obtained in violation of a

defendant's Fourth Amendment right, fails to yield appreciable deterrence, exclusion is unwarranted).

The magistrate judge conceded that a rigid application of *McClain* would "favor the defense" in this case, due to the involvement of Detective Dunn as a participant in the initial search and in obtaining the warrant. [Record No. 44, p. 27] However, he correctly noted that a rigid application of *McClain* is inconsistent with *Herring* and *Davis*. The undersigned agrees that, in entering the curtilage and the residence at 380 White Oak, the officers – at worst – simply misjudged the degree of emergency involved.[11] The magistrate judge appropriately considered the factors announced under *Leon*, and then applied the balancing test by requiring that, for a court to suppress evidence following a finding of a Fourth Amendment violation, the benefits of deterrence must outweigh the costs. [*Id.* (quoting *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010)).] The undersigned agrees with the admonition regarding any so-called "standard policy" where it is customary to enter a home upon finding a point-of-entry. However, there is no evidence that this is a systemic problem with the Lexington Police Department. Rather, as the magistrate judge found, the deterrent value of suppression in this case would be low: "The facts of this case are unusual, from the genesis of the event (with no 911 call and personal transportation of the assault victim) to the violence of the assault themselves." [*Id.*, p. 29] In this case, where there is no evidence of wrongdoing or systemic unconstitutional measures by

---

[11] This becomes a circular assessment, as the officers could not have known that they misjudged the degree of emergency until actually entering the home itself and upon finding no victims. This is precisely why this type of "Monday morning quarterbacking" is – and should be – disfavored by courts. *See Ryburn v. Huff*, 132 S. Ct. 987, 922 (2012) ("Reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (internal citations and quotation marks omitted).

the police, "suppress[ion] would simply reflect a different situational value judgment on a set of difficult facts and likely would have no impact on future conduct in such dynamic and ambiguous circumstances." [*Id.*] Thus, the good faith exception would bar the application of the exclusionary rule, even if the initial search was unlawful. However, as noted above, it was not.

### IV.

For the reasons set forth above, it is hereby

**ORDERED** as follows:

1. Defendants Marques Dawson and Manee Shephard's Motion to Suppress [Record No. 26] is **DENIED**.

2. The Magistrate Judge's Recommended Disposition [Record No. 44] is **ADOPTED** and **INCORPORATED** by reference.

3. The defendants' objections to the Recommended Disposition [Record Nos. 50, 53] are **OVERRULED**.

This 29th day of March, 2013.



Signed By:
*Danny C. Reeves* DCR
United States District Judge